IRVING, P.J.,
for the Court:
¶ 1. Kevin Dale McCain was convicted in the Warren County Circuit Court of robbery and sentenced to life in the custody of the Mississippi Department of Corrections, as a habitual offender, without eligibility for parole or probation. Feeling aggrieved, McCain appeals and asserts that: (1) the State failed to prove his habitual-offender status; (2) his case should have been dismissed due to speedy-trial violations; (3) the circuit court erred in allowing a cap into evidence; and (4) the circuit court should have quashed his indictment.
¶ 2. Finding no reversible error, we affirm the judgment of the circuit court.
FACTS
¶ 3. Cheryl Jinkins was working as a teller at a Trustmark Bank in Vicksburg, Mississippi, on January 30, 2008, when she was approached by a man who handed her a note. The note stated: “I want 20000[sic] in 100s, 50s, & 20s[,] or all die.” Jinkins attempted to comply with the note’s demand. When she opened her drawer to retrieve money for the man, the bank’s silent alarm was triggered. Jinkins handed the man approximately $2,100 in cash. After the robber had received the money, he left the bank. The police officers who investigated the robbery retrieved the bank’s surveillance footage. The footage contains images of the robber, who appeared to be wearing a grey or blue jacket, blue jeans, boots, and an orange Texas Longhorns hat. Images from the surveillance footage were released to the local news media in an effort to identify the robber.
¶ 4. Approximately two hours after the robbery, Officer Rita McNair of the Men-denhall Police Department was conducting a road block on Highway 13 in Menden-hall, Mississippi, due to construction. While Officer McNair had vehicles *1133 stopped, one automobile driver drove around the road block and attempted to proceed past Officer McNair. Officer McNair stopped the vehicle, which was driven by McCain. Officer McNair arrested McCain for driving with a suspended license, failing to yield to blue lights, improper passing, and reckless driving. Officer McNair testified that she and other officers noticed that McCain “had a lot of money on him.” McCain paid almost fifteen hundred dollars in cash to bond out from the arrest and was released. The vehicle that he had driven remained impounded near Mendenhall.
¶ 5. Officer McNair was watching the evening news on January 30, 2008, when she saw a segment on the robbery. Officer McNair testified that she recognized McCain from his arrest; Officer McNair “also recognized ... the cap that he was wearing.” Investigator Robert Stewart with the Vicksburg Police Department was ultimately contacted as a result of Officer McNair’s identification.
¶ 6. The day after the robbery, McCain went to retrieve his vehicle and was arrested by Officer McNair; Officer McNair testified that McCain was wearing an orange Texas Longhorns cap at the time of his arrest. Investigator Stewart obtained a search warrant for McCain’s vehicle, and then he proceeded to search the vehicle with other officers. On the front passenger seat of the vehicle was a note that read: I want 20000[sic] in 100s, 50s, & 20s[,] or all die.” Another note reading “100s & 50s & 20s” was also found in the vehicle. McCain’s home was later searched pursuant to a search warrant. Inside, officers found clothing similar to that worn by the bank robber.
¶ 7. Investigator Troy Kimble with the Vicksburg Police Department went to the Simpson County Jail to transport McCain to Vicksburg and obtained an orange Texas Longhorns cap from the Simpson County Jail at that time. At trial, the State admitted the cap into evidence, despite an objection that the cap had not been properly authenticated and that the chain of custody had not been proven.
¶ 8. On February 7, 2008, Jinkins identified McCain from a photographic lineup that was shown to her at the Vicksburg Police Department. At trial, Jinkins identified McCain as the man who had robbed her. At trial, Jinkins also identified the note that was handed to her during the robbery. The note had been recovered from McCain’s vehicle.
¶ 9. At the conclusion of the trial, McCain was found guilty. During the sentencing hearing, the State introduced a variety of documents in an effort to prove McCain’s status as a habitual offender. The documents included certified copies of McCain’s prior convictions and a report from the Federal Bureau of Prisons. O’Neal Brown, a federal probation officer, testified at the sentencing hearing that, based on the report, McCain had served more than a year and a day for his prior convictions. The circuit court declined to make a ruling as to McCain’s habitual-offender status at the conclusion of the hearing; instead, the court gave the State a week to produce additional records proving McCain’s habitual-offender status. One week later, the State filed a report from Vincent Shaw, an employee of the Federal Bureau of Prisons, regarding McCain’s prior convictions. Three weeks later, the sentencing hearing was resumed. At its conclusion, the circuit court found that it had sufficient evidence showing McCain’s status as a habitual offender. McCain was accordingly sentenced to life imprisonment as a habitual offender, without eligibility for parole or probation.
*1134 ¶ 10. Additional facts, as necessary, will be related during our analysis and discussion of the issues.
ANALYSIS AND DISCUSSION OF THE ISSUES

1. Habitual-Offender Status

¶ 11. The document that was filed by the State after the initial sentencing hearing was sufficient to prove McCain’s habitual-offender status. That document, which was produced by the Federal Bureau of Prisons, was attached to a letter of certification. The document showed that McCain had two prior convictions for which he had served at least a year and a day for each conviction.
¶ 12. McCain complains that the State failed to introduce the newer document as an exhibit during the continued sentencing hearing. While this is true, the document, with an attached letter of certification, was filed in the circuit court. Furthermore, the circuit court took notice of the document at the second sentencing hearing.
¶ 18. Under these circumstances, we find that there is sufficient evidence to support the circuit court’s finding of McCain’s habitual-offender status. This contention of error is consequently without merit.

2. Speedy-Trial Violations

¶ 14. McCain alleges that both his constitutional and statutory rights to a speedy trial were violated. McCain was arrested on January 30, 2008, indicted on May 8, 2008, and arraigned on May 9, 2008. On July 25, 2008, the circuit court held an omnibus hearing, wherein the State indicated that the charge against McCain might be dropped in favor of federal prosecution of the robbery; the case was continued to allow the district attorney’s office time to decide whether it would continue its prosecution of McCain. On July 26, 2008, McCain sent a letter to the circuit court, which the court interpreted as a demand for a speedy trial. McCain was set for trial on September 10, 2008, but his trial was reset due to the circuit court’s docket. On February 13, 2009, McCain filed a motion to dismiss because of the alleged violation of his right to a speedy trial. The State requested that McCain’s trial be set for March 2009, which was the first court setting available. On March 10, 2009, two weeks before McCain was set to go to trial, McCain’s attorney filed a motion to withdraw, stating that irreconcilable differences had arisen between him and McCain. McCain retained a new attorney, and his case was continued for reasons that are not stated in the record. Due to the nearness in time to the date of trial, it is likely that McCain’s attorney needed more time to prepare for trial. A joint motion for continuance was filed and granted in June 2009, and McCain was finally tried on September 14, 2009.
¶ 15. For clarity’s sake, we discuss McCain’s statutory and constitutional rights separately.

a. Constitutional Right

¶ 16. The Sixth Amendment to the United States Constitution guarantees defendants “the right to a speedy and public trial.... ” U.S. Const. amend. VI. Mississippi courts utilize the factors found in Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) when determining whether a defendant’s constitutional right to a speedy trial has been violated. Murray v. State, 967 So.2d 1222, 1229 (¶ 22) (Miss.2007). The factors are: “length of delay, the reason for the delay, the defendant’s assertion of his right, and prejudice to the defendant.” Id. (quoting Barker, 407 U.S. at 530, 92 S.Ct. 2182). In determining whether a defendant’s constitutional right to a speedy trial has been *1135 violated, the right attaches “at the time of arrest.” Id. at 1280 (¶ 28) (quoting Atterberry v. State, 667 So.2d 622, 626 (Miss.1995)).
¶ 17. As to the factor of delay, “any delay of eight (8) months or longer is presumptively prejudicial.” Id. (quoting Noe v. State, 616 So.2d 298, 300 (Miss. 1993)). Here, McCain was arrested on January 30, 2008, and he proceeded to trial on September 14, 2009. Therefore, more than eight months passed between the time of McCain’s arrest and his trial. Therefore, the delay in bringing him to trial is presumptively prejudicial.
¶ 18. When looking at the reasons for any delays, “[a]ny delay caused by a particular party will be assessed against that party.” Thomas v. State, 48 So.3d 460, 476 (¶ 45) (Miss.2010) (citing Poole v. State, 826 So.2d 1222, 1229 (¶20) (Miss. 2002)). Additionally, “[b]ecause the State bears the burden of providing a speedy trial, it must show either a delay caused by the defendant or good cause for the delay.” Id. (citing Hersick v. State, 904 So.2d 116, 121 (¶ 7) (Miss.2004)). In Thomas, the Mississippi Supreme Court stated that delays over which the State has no control do not weigh against the State. See id. at 476 (¶¶ 45-46) (citing Fleming v. State, 604 So.2d 280, 299 (Miss.1992)). However, there are numerous cases from both the Mississippi Supreme Court and this Court stating that congested court dockets will be held against the State, but only slightly. See, e.g., Murray, 967 So.2d at 1230 (¶ 26); Houser v. State, 29 So.3d 813, 821-22 (¶ 21) (Miss.Ct.App.2009). One of the delays in this case occurred because McCain and the State had agreed to continue his trial, and we will not count those three months against the State. The delay in July 2008 apparently occurred because the State was unsure whether it was going to continue its prosecution of McCain. Therefore, we count the months between July 2008 and September 2008 against the State. The record shows no particular explanation for any other delays except the circuit court’s crowded docket. Therefore, we find that all of those delays weigh only slightly against the State. After having examined all of the delays that occurred, we find that this factor weighs only slightly toward a finding of a violation of McCain’s right to a speedy trial, as only two months out of the time that it took to bring McCain to trial can be shown to weigh significantly against the State.
¶ 19. In the July 2008 letter that McCain sent to the circuit court, McCain wrote:
I am writing concerning my incarceration here at Warren Co. Jail. If you recall[,] I appeared before you on Fri. July 25 for my ominous [sic] hearing, and I am represented by Louis Field. There was [sic] some issues I wanted to address but was unable to do so.
I have been here since Jan. 28[sic], and approximately two months ago I was informed by my attorney that the State was not going to prosecute my case due to the fact that the Feds were also charging me in the same matter, since no motions were filed on my behalf yesterday or any new date set[,] I now sit here with no court date and the State has no intention in [sic] prosecuting my case. I got the impression that my attorney and the DA were avoiding the issue. I think a reminder to Mr. Smith, from you, would set things in motion, respectfully requested of course!
Like you said, “There is no sense in me eating up the county’s food.”
We find no fault with the circuit court’s decision to view this letter as a demand for a speedy trial, as McCain requested that the court “set things in motion.” There *1136 fore, we find that McCain asserted his right to a speedy trial. This factor weighs in favor of a finding that McCain’s right to a speedy trial was violated.
¶ 20. Finally, we find that the factor of whether prejudice occurred weighs heavily in favor of the State. As stated in Thomas:
When analyzing the prejudice prong under Barker, [an appellate court] considers: (1) the “actual prejudice to the accused in defending his case, and (2) interference with the defendant’s liberty.” Brengettcy [v. State], 794 So.2d [987,] 994 [ (¶ 20) (Miss.2001) ] (quoting Perry v. State, 637 So.2d 871, 876 (Miss. 1994)). [An appellate court] considers three interests when analyzing whether a defendant has suffered prejudice for a lengthy delay in the speedy-trial context: “(1) preventing ‘oppressive pretrial incarceration!;] (2) minimizing anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired.” IcL (citing Barker, 407 U.S. at 632, 92 S.Ct. 2182).
Thomas, 48 So.3d at 476 (¶ 49). McCain provides no explicit examples of how the delay in bringing him to trial prejudiced his defense, other than to state that his incarceration caused him anxiety and “inherently prejudiced” his defense. Having reviewed the record, we can find no evidence to show that McCain was prejudiced by the delay in bringing him to trial.
¶ 21. Although three of the four Barker factors weigh somewhat in McCain’s favor, we nonetheless find that his constitutional right to a speedy trial was not violated since there is no evidence that his case was prejudiced in any way by the delay in bringing him to trial, a factor that weighs heavily in the State’s favor.

b. Statutory Right

¶ 22. McCain also asserts that his statutory right to a speedy trial- was violated. Section 99-17-1 of the Mississippi Code Annotated (Rev.2007), states that criminal cases should be tried within 270 days after a defendant has been arraigned. “When the accused is not tried within 270 days of his arraignment, the State has the burden of establishing good cause for the delay since the accused is under no duty to bring himself to trial.” Jenkins v. State, 947 So.2d 270, 275 (¶ 9) (Miss.2006) (citing Herring v. State, 691 So.2d 948, 953 (Miss.1997); Perry v. State, 419 So.2d 194, 199 (Miss.1982)).
¶23. McCain was arraigned on May 9, 2008, and tried on September 14, 2009. Therefore, more than 270 days had passed between the time of his arraignment and trial. However, good cause exists for all but two months of the delay. One delay was caused by McCain’s agreement to a continuance, and the rest of the delays were apparently caused by the circuit court’s congested docket. Delays caused by factors such as a crowded court docket constitute good cause. Id. at 275-76 (¶ 10) (citing Herring, 691 So.2d at 953). Therefore, McCain’s statutory right to a speedy trial was not violated.
¶ 24. This contention of error is without merit.

3. Admission of Cap into Evidence

¶25. In his third contention of error, McCain complains about the entry into evidence of a Texas Longhorns cap, which was admitted as exhibit S-24. McCain contends that the cap was not properly authenticated in accordance with Rule 901 of the Mississippi Rules of Evidence because the chain of custody was not established. We review the circuit court’s decision to admit the cap into evidence under an abuse-of-discretion standard. Williams v. State, 35 So.3d 480, 488 (¶ 25) (Miss.2010).
*1137 ¶ 26. The relevant portion of Rule 901 states: “The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.” The Mississippi Supreme Court has stated the following standard related to authentication of evidence and chain of custody:
Our precedent is clear that “Mississippi law has never required a proponent of evidence to produce every handler of evidence.” Ellis v. State, 934 So.2d 1000, 1005 [ (¶ 21) ] (Miss.2006). In order for the defendant to show a break in the chain of custody, there must be an “indication or reasonable inference of probable tampering with the evidence or substitution of the evidence.” Spann v. State, 771 So.2d 883, 894 [ (¶ 26) ] (Miss. 2000). The defendant has the burden of proving tampering or substitution of the evidence, and “a mere suggestion that substitution could possibly have occurred does not meet the burden of showing probable substitution.” Ellis, 934 So.2d at 100 [6 (¶ 21) ].
Deeds v. State, 27 So.3d 1135, 1142 (¶ 20) (Miss.2009).
¶ 27. To be thorough, we quote at length from Investigator Kimble’s testimony when the State introduced the cap into evidence:
Q. I hand you this and ask if you can identify that?
A. Yes, sir. This is my evidentiary item No. 8 which is a bag that was taken of the [sic] Texas Longhorn[s] hat, baseball[-]type cap that was worn by the suspect.
Q. And whose handwriting is on that bag?
A. That’s my handwriting on the bag.
Q. Who recovered that item?
A. I recovered this item. Well, this item was actually recovered by the Simpson County jailer and the item was transferred over to my possession from there.
Q. Did you receive that from the Simpson County jailer?
A. Yes, sir, I did.
Q. Can you open that bag for us, please?
[DEFENSE ATTORNEY]: Your Hon- or, I would like to object. May we approach the bench?
[COURT]: Yes, sir.
(THE FOLLOWING PROCEEDINGS WERE HAD AND HEARD AT THE BENCH OUTSIDE THE HEARING OF THE JURY PANEL).
[DEFENSE ATTORNEY]: He’s testified that he received that out of the regular chain of custody. And he has nothing else to tie this to the Defendant. They need to explain to the jury how they received this.
[COURT]: Tell me a little bit more on how he got this and where he got it from.
[PROSECUTOR]: Once he searched the home he went back to the Sharkey [sic] County Sheriff’s] Department where Mr. Kevin McCain—
[COURT]: Mendenhall?
[PROSECUTOR]: I mean, yeah, I’m sorry, Simpson County Sheriff[’s] Department. Mr. McCain had been arrested earlier at the time he had attempted to come and get his vehicle back. Ms. McNair testified yesterday that he was still wearing that same baseball cap on the morning that he came back to get his vehicle. So we have that officer saying that when he appeared he had the—
[COURT]: I’m trying to get how Men-denhall got it.
*1138 [PROSECUTOR]: He was arrested.
[COURT]: He was under arrest at that time?
[PROSECUTOR]: Yeah, they arrested him when he came back to pick the vehicle up. So he was arrested based upon—
[COURT]: Well, I need a little bit more. I need some predicate from him on how he got it and where did he get it from.
(THE FOLLOWING PROCEEDINGS WERE HAD AND HEARD IN OPEN COURT WITHIN THE HEARING OF THE JURY PANEL).
Q. Lets [sic] go back for a second. How did you become aware that the suspect of the Trustmark National Bank had been found in Simpson County?
A. A call was made to Lieutenant Robert Stewart as Chief of Investigations by Mr. Barlow[,] the Chief of Simpson County, Mendenhall PD. Officer McNair, Rita McNair, made a traffic stop for a traffic violation of Mr. McCain and once she called back and made contact with Lieutenant Stewartf,] it was advised that the suspect that was listed by the media as being the bank robber was wearing the same items—
[DEFENSE ATTORNEY]: Objections [sic], Your Honor, it sounds like hearsay.
[COURT]: Overruled.
A. [ — ] Was wearing the same items that [sic] when I arrested him that the photo was shown from the media.
[[Image here]]
Q. Were you aware of where the Defendant was when you arrived in Simpson County the next morning?
A. Not his exact location. My understanding was that he had been released and hew as [sic] to come back to pick up the vehicle once the towing service was open.
Q. Based upon your investigation[,] were you aware of what happened when he came back to pick up the vehicle?
A. Yes, sir, he was placed in custody by Chief Barlow and Rita McNair.
Q. And were you aware of where he remained until he was brought back to Vicksburg?
A. Yes, sir, he was incarcerated in Simpson County.
Q. Now, who, if anyone, did you talk with about the personal items that Mr. McCain had on him at the time of his arrest when you arrived at Simpson County, Mississippi?
[DEFENSE ATTORNEY]: Objection, Your Honor, hearsay.
[COURT]: Overruled.
A. That would have been the officer that made the initial arrest, Rita McNair, as well as Lieutenant Robert Stewart. We were all there together.
Q. And after you searched the home of Mr. McCain, what did you do next?
A. After obtaining items of evidenee[,] which were the boots and the actual windbreaker[-]type jacket[,] we returned back to Simpson County Jail from Pedal [sic] to interview Mr. McCain or to pick him up and take him back to Vicksburg.
Q. Did you acquire any items that were being held of Mr. McCain’s at the time that you acquired Mr. McCain to take him back to Vicksburg?
A. Yes, sir, I did. And those were his personal possessions^] which included a Texas Longhorn, orange in *1139 color, baseball[-]type cap. I think a black wallet and all of his personal possessions that he had turned into the—
Q. And from where did you receive those?
A. From the Simpson County [J]ail.
Q. And I’ll ask you again can you identify those—
[DEFENSE ATTORNEY]: Your Hon- or [,] I’m going to renew by [sic] objection.
[COURT]: Well, let me see what he says is in that bag first.
[DEFENSE ATTORNEY]: Well, Your Honor, I object to have [sic] anything put before the jury at this point and time until the chain of custody has been established.
[COURT]: Well, I don’t know what he said he retrieved. I don’t know what is in that bag, that is what I’m saying.
[DEFENSE ATTORNEY]: Then I would ask for a hearing outside the presence of the jury then to have that brought forth.
[COURT]: Well, I think you made your motion[,] and I ruled that your objection is overruled as to the chain of custody at this point.
Q. And can you identify what is in that bag?
A. Yes, sir. It is an orange in color Texas Longhorn[s] logo baseball cap.
Q. And where did you obtain that?
A. From the Simpson County Jail.
[DEFENSE ATTORNEY]: Your Hon- or, I object. It did not come from the Defendant.
[COURT]: Well, I understand your objection[,] and I have ruled that-come from who?
[DEFENSE ATTORNEY]: The Defendant.
[COURT]: Overruled.
Q. Can you open that, please, sir?
(WITNESS OPENS BAG).
Q. Can you identify what was in that package?
A. Yes, sir. It’s a[sic] orange in color Texas Longhorn[s] logo baseball cap.
Q. And did you personally recover that from the Simpson County lockup?
A. Yes, sir.
Q. And what other items did you recover at the time you recovered that hat?
A. I think it was a black wallet[,] and I have to look at my notes.
(WITNESS CHECKS HIS NOTES).
A. I stand corrected. This was the only item that actually I recovered. The wallet was actually recovered from the passenger seat. I stand corrected on that.
Q. All right.
[PROSECUTOR]: Your Honor, we would ask that this be marked as an exhibit to the witnesses] testimony.
[COURT]: The same objection?
[DEFENSE ATTORNEY]: Yes, Your Honor.
[COURT]: It will be marked as Exhibit No. 24.
¶ 28. Under the deference with which we treat the circuit court’s decision, we find that there was a sufficient basis for the admission of the cap into evidence. Officer Kimble testified that he retrieved the cap directly from the Simpson County Jail at the same time he took McCain from the jail. Officer McNair testified that McCain was wearing the cap when he was arrested at the impound lot. The circuit *1140 court did not abuse its discretion in admitting the cap into evidence.
¶ 29. Furthermore, even if the circuit court had erred in admitting the cap into evidence, that error would be harmless at worst, as there is overwhelming evidence of McCain’s guilt. See Clark v. State, 891 So.2d 186, 142 (¶ 30) (Miss.2004). That evidence includes an eyewitness identification and the discovery of the demand note in McCain’s vehicle. The jury also viewed video footage of the bank robbery and had the opportunity to observe McCain in court.

Jp. Indictment

¶ 30. In his final contention of error, McCain argues that the circuit court erred when it declined to quash his indictment. McCain’s specific contention is that his indictment “was not stamped ‘filed’ as required by Section 99-7-9.”
¶ 31. Although McCain filed a pro se motion challenging his indictment, that motion did not explicitly raise the issue of whether “filed” was stamped on his indictment. Rather, the motion stated, among other things:
That this Court entered an order on Dec[.] 12, 2008[,] to reflect the date of the indictment to Jan[.] 30, 2008.... That the indictment prior to amendment was invalid in that it was not properly filed by the circuit clerk of Warren Co. and that this Court was not within its jurisdiction to amend said indictment.
However, the circuit court and the State interpreted this motion as an attack on the indictment for failing to contain the word “filed.” McCain did not file his motion prior to trial; rather, the motion was filed on September 15, 2009, after his trial had begun on September 14, 2009.
¶ 32. The placement, or lack thereof, of “filed” on the indictment is undoubtedly an error of form, not substance. See Jones v. State, 356 So.2d 1182, 1184 (Miss.1978). And because that error occurred on the face of the indictment, McCain was required to lodge an objection to the indictment prior to the commencement of his trial. Miss.Code Ann. § 99-7-21 (Rev. 2007). Therefore, McCain did not raise the issue timely, and this contention of error is procedurally barred.
¶ 33. Procedural bar notwithstanding, the presence of “filed” on the indictment was a matter of form. As the circuit court noted, the indictment was presented to a grand jury and later provided to McCain. There is no doubt that McCain was informed of the nature of the charges against him. Therefore, a procedural error on the indictment is an insufficient reason to reverse his conviction, which is in accord with the overwhelming weight of the evidence at trial.
¶ 34. This contention of error is also without merit.
¶ 35. THE JUDGMENT OF THE CIRCUIT COURT OF WARREN COUNTY OF CONVICTION OF ROBBERY AND SENTENCE, AS A HABITUAL OFFENDER, OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITHOUT ELIGIBILITY FOR PAROLE OR PROBATION, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO WARREN COUNTY.
LEE, C.J., GRIFFIS, P.J., MYERS, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR. BARNES, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.